1
2
3
4
5
6
7
## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WASHINGTON
## AT SEATTLE
8
9

UNITED STATES OF AMERICA,

           Plaintiff,

    v.

MARVIN WILBUR, SR., et al.,

           Defendants.

Case No. CR09-191 MJP

**ORDER DENYING DEFENDANTS'
MOTIONS TO DISMISS, MOTION
IN LIMINE, MOTION TO SEVER,
AND MOTION TO SUPPRESS**

16        This matter comes before the Court on six motions from Defendants C. Marvin Wilbur,

17  Sr., Joan Wilbur, April Wilbur, and Brenda Wilbur: (1) Defendants' Motion to Dismiss All

18  Counts on Tax Law and Due Process Grounds (Dkt. No. 43); (2) Defendants' Motion to Dismiss

19  the Indictment for Lack of a Predicate Violation of State Cigarette Tax Laws (Dkt. No. 86); (3)

20  Defendant April Wilbur's Motion in Limine and to Strike Allegations (Dkt. No. 51); (4)

21  Defendants' Motion to Dismiss the Indictment on Treaty Grounds (Dkt. No. 45); (5) Defendant

22  Brenda Wilbur's Motion to Sever (Dkt. No. 89); and (6) Defendants' Motion to Suppress (Dkt.

23  No. 90). The Court has reviewed the motions, the government's responses (Dkt. Nos. 77, 78, 80,

24  100, 101, 102), Defendants' replies (Dkt. Nos. 84, 87, 105, 107, 108), and all papers submitted in

25  support thereof. On January 22, 2010, the Court heard oral argument on every motion except for

26  the Motion in Limine, and held an evidentiary hearing as to the Motion to Dismiss on Treaty

Grounds and the Motion to Suppress. (Dkt. No. 116.) For the reasons set forth below, the Court DENIES each of the motions filed by Defendants.

**Background**

A.     Indictment

Defendant Marvin Wilbur, Sr. is the alleged owner and operator of the Trading Post at March Point, a business operated on the Swinomish Reservation. (Second Superseding Indictment ["SSI"] ¶ 6.) The Trading Post is a retail establishment that sells cigarettes to Swinomish members and nonmembers alike. (SSI ¶ 5.) It is also referred to as a smokeshop. Defendant Joan Wilbur, Mr. Wilbur, Sr.'s wife, is alleged to have been involved in the wholesale purchase and retail sales of cigarettes at the Trading Post through three trusts in which she was a trustee: the Salish Trust, the Skagit Trust, and the Skagit Cigarette Sales Trust. (Id. ¶ 7.) Both Marvin Wilbur, Sr. and Joan Wilbur are enrolled members of the Swinomish Indian Tribal Community. (Id. ¶ 6.) Defendants Brenda Wilbur and April Wilbur, daughters-in-law of Marvin, Sr. and Joan Wilbur, are alleged to have been involved in the wholesale purchase and retail sale of cigarettes at the Trading Post. (Id. ¶¶ 9-10.) Neither is alleged to be a member of the Swinomish Indian Tribal Community.

On May 15, 2007, federal agents executed a search warrant for the Trading Post, and confiscated approximately 3,609,820 cigarettes in packaging that did not bear evidence of payment of state taxes. (SSI ¶ 7.) The search was lead by J. Mark Keller, a Lieutenant with the Washington State Liquor Control Board who was deputized as a Special Deputy United States Marshall. At the hearing held before the Court on January 22, 2010, both Agent Keller and Eric Younger, a forensic auditor with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), testified as to the scope of the search and the items seized.

On June 10, 2009, all four Defendants were indicted on one count of conspiracy to traffic in contraband cigarettes and five counts of trafficking in contraband cigarettes in violation of the Contraband Cigarette Trafficking Act ("CCTA"). (Dkt. No. 1.) The government filed a twenty-

count superseding indictment on October 15, 2009, which added fourteen new counts: one count of conspiracy to launder money and thirteen counts of money laundering. (Dkt. No. 34.) On October 29, 2009, the government filed a second superseding indictment (the "Indictment"), which added one more count of trafficking in contraband cigarettes. (Dkt. No. 54.) Marvin, Sr. and Joan Wilbur are named in every count. April Wilbur is named in the five of the six CCTA counts, the CCTA conspiracy count, and in eight of the thirteen money laundering counts. Brenda Wilbur is named in the CCTA conspiracy count, three CCTA counts, and one money laundering count. The CCTA violations serve as the predicate acts for the money laundering counts.

The Indictment alleges that from July 28, 1999 through May 15, 2007, Defendants purchased at least 792,981 cartons of cigarettes for resale at the Trading Post that bore neither state cigarette tax stamps nor tribal state tax stamps. (SSI ¶¶ 20, 22.) Defendants are alleged to have engaged in a conspiracy to violate the CCTA over this 8-year period. (Id.) "By not affixing the stamps and not paying the applicable cigarette taxes, the Defendants avoided paying approximately $10,984,565 in cigarette taxes. . . ." (Id. ¶ 22.) The Indictment also alleges that Defendants laundered the proceeds from the sale of contraband cigarettes from 2005 to May 15, 2007. (Id. ¶¶ 38-65.)

B.     Statutory Scheme

The CCTA makes it unlawful for any person "knowingly to ship, transport, receive, possess, sell, distribute, or purchase contraband cigarettes or contraband smokeless tobacco." 18 U.S.C. § 2342(a). The Act defines "contraband cigarettes" as 10,000 or more cigarettes that "bear no evidence of the payment of applicable State or local cigarette taxes . . . if the State . . . requires a stamp . . . to be placed on packages or other containers of cigarettes to evidence payment of cigarette taxes. . . ." 18 U.S.C. § 2341(2). Application of the CCTA thus turns on the relevant State or local cigarette tax laws. See United States v. Gord, 77 F.3d 1192, 1193 (9th Cir. 1996).

With limited exceptions, all cigarettes sold in Washington must bear a state tax stamp, "whether or not such tax has been paid or whether an exemption from the tax applies." RCW 82.24.030(1); RCW 82.24.020. Retailers and consumers cannot possess unstamped cigarettes. RCW 82.24.050. Cigarettes that lack tax stamps are deemed contraband under Washington law, and are therefore contraband under the CCTA. WAC 458-20-186; <u>Grey Poplars Inc. v. One Million Three Hundred Seventy-One Thousand One Hundred (1,371,100) Assorted Brands of Cigarettes</u>, 282 F.3d 1176, 1178 (9th Cir. 2002). Cigarettes sold by an Indian tribal organization to an enrolled member of that tribe are exempt from state tax. RCW 82.24.020(6). However, those cigarettes must still bear an "exempt" stamp. RCW 82.24.030(1)-(2); WAC 458-20-192(9)(a)(ii); <u>United States v. Fiander</u>, 547 F.3d 1036, 1038-39 (9th Cir. 2008).

Washington also regulates the transportation of cigarettes within the state. Any person other than a licensed wholesaler (not applicable here), must give notice to the Washington State Liquor Control Board "in advance of the commencement of transportation" of unstamped cigarettes. RCW 82.24.250(1). Similarly, any person, including an Indian tribal organization, who imports or causes to be imported unstamped cigarettes must give notice to the Liquor Control Board and affix tax stamps or tax exempt stamps. RCW 82.24.250(7)(d); <u>see</u> <u>Grey Poplars</u>, 282 F.3d at 1178 ("Washington law requires that cigarettes destined for sale to Indians be pre-approved by the Washington State Department of Revenue. . . ."). Cigarettes transported in violation of the State notification rules are deemed to be contraband. RCW 82.24.250(4).

It is long-standing law that state cigarette taxes apply to on-reservation sales to nonmembers and non-Indians. <u>Washington v. Confederated Tribes of the Colville Indian Reservation</u>, 447 U.S. 134, 159 (1980). In addition to the state, a tribe may tax the sale of cigarettes on its reservation and trust land. <u>Id.</u> at 152. This includes sales to members and nonmembers alike. This has created the potential for dual taxation of cigarette sales, which Washington has attempted to address through tax contracts with certain tribes.

C.    <u>Cigarette Tax Contracts</u>

The State of Washington authorizes the governor to enter into tax contracts "in regard to retail sales in which Indian retailers make delivery and physical transfer of possession of the cigarettes from the seller to the buyer within Indian country." RCW 43.06.455(1)-(2). A cigarette tax contract "shall provide for a tribal cigarette tax in lieu of all state cigarette taxes and state and local sales and use taxes on sales of cigarettes in Indian country by Indian retailers." RCW 43.06.455(3). The State's forbearance from collecting and imposing its cigarette tax is referred to as a "retrocession," which is defined generally as "[t]he act of ceding something back." Black's Law Dictionary 1343 (8th ed. 2004). Under RCW 43.06.455(3) and pursuant to the actual terms of a negotiated tax contract, the state gives up its taxing authority and agrees that the tribe has the sole power to tax on-reservation cigarette sales. All tax contracts must meet the requirements of 43.06.455, but nothing in this statute bars the governor from entering into a contract that narrows the scope of this tax retrocession.

The tax retrocession is a limited exception to the State's cigarette taxation regime. First, it applies only to cigarette sales by "Indian retailers," a term defined as "(i) a retailer wholly owned and operated by an Indian tribe, (ii) a business wholly owned and operated by a tribal member and licensed by the tribe, or (iii) a business owned and operated by the Indian person or persons in whose name the land is held in trust." RCW 43.06.455(14)(b). Second, all "cigarettes possessed or sold by a retailer shall bear a cigarette stamp obtained by wholesalers from a bank or other suitable stamp vendor and applied to the cigarettes." RCW 43.06.455(4). Third, Indian retailers may only purchase cigarettes from (a) licensed wholesalers or manufacturers, (b) out-of-state wholesalers or manufactures that agree to comply with the tax contract's provisions and are certified by the state, (c) a tribal manufacturer, or (d) a tribal wholesaler who purchases from any of the above three entities. RCW 43.06.455(5).

The Swinomish Indian Tribal Community and State of Washington entered into a tax contract on October 3, 2003. ("Cigarette Tax Contract Between the Swinomish Tribe and the State of Washington" ("Tax Contract"), Oct. 3, 2003, Preamble (Dkt. No. 44-2).) The Tax

Contract tracks much of the enabling statute's language, but provides a narrower exception to the state's taxing authority. The Tax Contract is limited to "the retail sale of cigarettes by Tribal retailers." (Tax Contract Part II(2).) "Tribal retailer" is a term of art defined by the Tax Contract as "a cigarette retailer wholly owned by the Swinomish Tribe and located in Indian country or a member-owned smokeshop located in Indian country and licensed by the Tribe." (Tax Contract Part I(20) (emphasis added).) This differs from the term "Indian retailer" in RCW 43.06.455, by omitting section 14(b)(iii)'s definition of Indian retailers on trust land.

Two other provisions in the Tax Contract narrow its scope. First, "[a]ll cigarettes sold by the Tribal retailer shall bear a Tribal tax stamp." (Part V(1)(a).[1]) Second, Tribal retailers are required to obtain a license from the Swinomish Tribe to qualify as "Tribal retailer." (Part III(1)(c).) Thus, to qualify as a conforming transaction, the sale must be by a licensed "Tribal retailer" and the cigarettes must have Tribal tax stamps. For "all transactions that conform with the requirements of this Contract, such transactions do not violate state law, and the State agrees that it will not assert that any such transactions violate state law for the purpose of 18 U.S.C. § 2342 [the CCTA]." (Part V(6).) For its part, the State agreed to "retrocede[] from its tax during the time this Contract is in effect." (Part III(2)(e).) The parties dispute the scope of this retrocession, which is discussed in detail below.

**Analysis**

A.    <u>Standard</u>

Under Federal Rule of Criminal Procedure 12(b), a defendant may file a pretrial motion raising "any defense, objection, or request that the court can determine without a trial of the general issue." Fed. R. Crim. P. 12(b)(2). "Rule 12(b) of the Federal Rules of Criminal Procedure permits consideration of any defense which is capable of determination without the trial of the general issue." <u>United States v. Nukida</u>, 8 F.3d 665, 669 (9th Cir. 1993) (quotation

---

[1] References to "Part . . ." are solely to the Tax Contract.

omitted).  A motion to dismiss is generally "capable of determination" before trial "if it involves questions of law rather than fact."  Id.  (quotation omitted).

A "defendant may not properly challenge an indictment, sufficient on its face, on the ground that the allegations are not supported by adequate evidence."  United States v. Jensen, 93 F.3d 667, 669 (9th Cir. 1996) (quotation omitted).  "If the pretrial claim is substantially founded upon and intertwined with evidence concerning the alleged offense, the motion falls within the province of the ultimate finder of fact, and must be deferred."  Nukida, 8 F.3d at 669 (quotation omitted).  If, however, the facts surrounding the commission of the alleged offense would be of no assistance in determining the validity of the defense raised, the defense issue is properly resolved before trial.  Id.  In any event, "[a] motion to dismiss the indictment cannot be used as a device for a summary trial of the evidence. . . ."  Jensen, 93 F.3d at 669 (quotation omitted).

B.    Tax Defense

Defendants request dismissal of the Indictment on the theory that the cigarettes possessed and sold at the Trading Post were not "contraband" under the CCTA.  Defendants' argument turns on a particular construction of the Tax Contract.  Defendants argue that the State retroceded from its cigarette tax during the effective period of the Tax Contract and that only tribal taxes were applicable, regardless of whether the sales conform to the Tax Contract.  Failure to pay a tribal tax, Defendants argue, does not convert the cigarettes into contraband under the CCTA because "contraband cigarettes" is defined only in reference to state, not tribal taxation.  The government proposes a much more reasoned reading of the Tax Contract, which squarely forecloses Defendants' argument that the state taxes were inapplicable to the sales at the Trading Post.  The Court agrees with the government and finds the Indictment's allegations sufficient to survive dismissal.

For sales that conform to its requirements, the Tax Contract provides a limited exception to the state's cigarette taxation rules.  A holistic reading of the Tax Contract bears out this point.  To begin, the "Application" section of the Contract provides that the Contract is "contingent on

the imposition of the Tribal cigarette tax." (Part II(2).) Cigarettes sold must bear evidence of payment of Tribal taxes. (Part V(1).) The Tax Contract also states that it "appl[ies] to the retail sale of cigarettes by Tribal retailers." (Part II(2).) A "Tribal retailer" is a specific term of art. It applies only to tribally run shops or member-owned smokeshops that are licensed by the Tribe. (Part III(1)(c).) The Tax Contract therefore applies only sales of tribally-stamped cigarettes by licensed Tribal retailers.

That the State "retrocedes from its tax during the time this Contract is in effect," does not expand the retrocession to sales that do not conform to the Contract's requirements. (Part III(2)(e).) This is clear not only from the fact that the Tax Contract is a limited exception to the State's taxation regime, but also from other relevant terms of the Contract. The Tax Contract provides that: "[a]s to all transactions that conform with the requirements of this Contract, such transactions do not violate state law, and the State agrees that it will not assert that any such transactions violate state law for the purpose of 18 U.S.C. § 2342 . . ."—the CCTA. (Part V(6).) Implicit in this statement is that the tax retrocession applies only to sales that conform to the Contact. It also implies that sales which do not conform to the Tax Contract are subject to state law and the CCTA. This accords with the general rule that all sales of cigarettes within Washington must conform to the state's cigarette tax requirements. The Court concludes that the State's retrocession under the Tax Contract applies only to sales that conform to its core requirements listed above.

Defendants argue that the State's retrocession applies to all sales, conforming or not, for the "effective period" of the Tax Contract. (See Dkt. No. 43 at 18-19.) Defendants rely on one subsection in Part III, which provides that "the State retrocedes from its tax during the time this Contract is in effect." (Part III(2)(e).) Read in isolation, this provision does suggest that no state taxes apply from 2003 through the eight-year term of the agreement, regardless of whether the Tribal retailer is licensed or whether the cigarettes are stamped. However, this provision must be read in the context of the full Tax Contract, and interpreted in tandem with, rather than at odds

with other provisions of the Contract. See Skamania County v. Columbia River Gorge Comm'n, 144 Wn.2d 30, 43 (2001) (a statute must be read in its entirety; language should not be read in isolation). The Tax Contract requires conformity with its provisions, and only then does its retrocession take effect and provide a limited exception to the State's cigarette tax requirements. To read Part III(2)(e) in isolation, as Defendants do, renders superfluous the limitations expressly set forth into the Tax Contract, especially in Part V(6). The Court therefore rejects Defendants' construction.

In light of the above construction of the Tax Contract, the Court finds no defect in the Indictment's allegations. Defendants were required and allegedly failed to have state cigarette tax stamps on the cigarettes sold at the Trading Post. First, Defendants are claimed to have purchased, possessed, and sold cigarettes from 1999 through May 15, 2007 that lacked evidence of tribal or state tax stamps. (SSI ¶ 22.) Under the Tax Contract, the state's retrocession of taxation authority does not apply to these transactions because they are nonconforming sales. This includes three alleged purchases of cigarettes during which the Trading Post was licensed by the Swinomish Indian Tribal Community. (SSI ¶¶ 24(g)-(j).) Because the cigarettes lacked tribal stamps during this period, they are still contraband, even if the Trading Post was a Tribal retailer. The Court does not reach the issue of whether Defendants qualified as Tribal retailers under the Tax Contract or Indian retailers under RCW 43.06.455. Regardless of whether they were such retailers, the Indictment sufficiently alleges that they sold contraband cigarettes.

Defendants contend that construing the Tax Contract as applying only to conforming sales leads to absurd results. Defendants use as an example a member-owned smokeshop that possesses cigarettes lacking state stamps that is licensed on Monday and Tuesday, has its license revoked on Wednesday and Thursday, and then has the license reinstated on Friday. (Dkt. No. 43 at 15.) Under the Court's construction of the Tax Contract, these cigarettes would be contraband on Wednesday and Thursday, but not on any other day of the week. While this does set forth an odd pattern, it is not absurd given that the Tax Contract provides only a limited

exemption to the presumption that state cigarette taxes apply to nearly all sales of cigarettes in Washington. Defendants cite no law that makes this taxation scheme improper or impermissible and the Court is not convinced it is defective. Defendants' argument is purely hypothetical. As alleged, Defendants possessed and sold unstamped cigarettes, a violation of the Tax Contract and State law, for over eight years. They are not being prosecuted for a two-day period in which they simply lacked a tribal license.

Defendants also argue that if there is ambiguity as to the tax retrocession it must be interpreted in their favor. (Dkt. No. 43 at 22-25.) "[T]he touchstone of the rule of lenity is statutory ambiguity." United States v. Hayes, 129 S.Ct. 1079, 1088 (2009) (quotation omitted). The Court applies the rule "only when, after consulting traditional canons of statutory construction, we are left with an ambiguous statute." United States v. Shabani, 513 U.S. 10, 17 (1994). The Court finds no ambiguity in the scope and application of the tax retrocession in the Tax Contract. The Court notes that Defendants argue that ambiguity exists in RCW 82.24 and 43.06, not the Tax Contract itself. However, there is no conflict between the Tax Contract and these state statutes which are not intended to trump the Tax Contract even if conflict existed. See RCW 82.24.020(7) ("If the state enters into a cigarette tax contract or agreement with a federally recognized Indian tribe under chapter 43.06 RCW, the terms of the contract or agreement shall take precedence over any conflicting provisions of this chapter while the contract or agreement is in effect.") That the Tax Contract narrows the definition of "Tribal retailer" is not a conflict, as the enabling legislation in RCW 43.06 does not bar the governor and tribes from narrowing the scope of the retrocession.

Defendants' tax retrocession theory does not convince the Court that the Indictment fails as a matter of law. The Court notes further that this district has reached the same result in two related civil forfeiture cases. United States v. Approximately Three Million Six Hundred Nine Thousand Eight Hundred Twenty Cigarettes of Assorted Brands, No. 07-cv-1603-TSZ, Dkt. No. 67 (W.D. Wash. July 2, 2009) (finding the cigarettes sold and held at the Trading Post at March

1  Point to be contraband under the CCTA and state law).  United States v. Funds . . . held in the

2  Name of R K Co., Inc. d/b/a Cigar Cartel Totaling $201,147.00, No. 08-cv-272-JCC, Dkt. No. 56

3  (W.D. Wash., Mar. 11, 2009) (same).  Defendants' motion dismiss on this issue is DENIED.

4  C.     Due Process

5          Defendants argue that the Indictment offends Due Process because the tax laws in play

6  are exceedingly complex and involve unsettled questions of law.  (Dkt. No. 43 at 25-28.)

7  Defendants argue that they lacked "fair notice" that their conduct violated the law because there

8  are "no cases establishing the illegality of their possession of unstamped cigarettes on a

9  reservation during the effective period of a cigarette tax contract."  (Dkt. No. 87 at 12.)

10  Defendants' argument is untenable.

11          The Ninth Circuit has rejected Defendants' argument insofar as it applies to the

12  interaction of the CCTA and Washington's law on contraband cigarettes.  United States v. Baker,

13  63 F.3d 1478, 1492 (9th Cir. 1995).  In Baker, the court held that "[t]he interaction between the

14  CCTA and Washington's tax scheme . . . does not involve a complex regulatory scheme with the

15  potential of trapping unwary merchants trading in cigarettes."  Id.  To the contrary, "[t]he law is

16  quite simple."  Id.  The Ninth Circuit also held that "knowledge of cigarette taxing requirements

17  can be presumed among those who deal in cigarettes in quantities exceeding 60,000."  Id.  The

18  sole question presented by Defendants, then, is whether the Tax Contract renders the taxation

19  scheme so complex as to make it impossible for them to know the conduct they allegedly

20  engaged in was illegal.

21          While the Tax Contract is not the most artfully drafted agreement, it is hardly a complex

22  tax statute.  The Tax Contract has straightforward requirements.  It simply adds one overlay to

23  the existing state cigarette tax scheme, and provides a limited exception to it.  It does not

24  dramatically alter the law in Washington as to cigarette taxation.  There is also no reason to

25  create an exception to the rule set out in Baker that people who deal in cigarettes in quantities

26  exceeding 60,000 are presumed to know the taxing requirements.  Baker, 63 F.3d at 1492.

1    The Court also notes that Defendants rely exclusively on case law involving prosecutions

2    of federal income tax violations.  (See Dkt. No. 43 at 25-27.)  Defendants cite no cases where

3    this theory has been applied to defend against CCTA and money laundering charges.  Rather, the

4    cases cited involve only criminal prosecutions for violating federal tax laws, not criminal statutes

5    of general application such as the money laundering statute and the CCTA.  Regardless,

6    Defendants' arguments are to no avail and the motion to dismiss is DENIED.

7    D.    Predicate Act Motion

8        Defendants move to dismiss the Indictment on the theory that the State's tax

9    requirements do not apply to on-reservation sales of cigarettes.  (Dkt. No. 86.)  Defendants

10   essentially ask Court to ignore Supreme Court authority and misapply two state court decisions.

11       Defendants contend that the cigarette tax laws do not apply to any sale of tobacco on

12   reservation.  Colville resolved this issue in 1980.  The Supreme Court held that the State of

13   Washington could impose a cigarette tax and record keeping requirements on tribal retailers

14   selling cigarettes on reservation to nonmembers and non-Indians without infringing on tribal

15   sovereignty.  447 U.S. at 156-159.  The Court held "that the State may validly require the tribal

16   smokeshops to affix stamps purchased from the State to individual packages of cigarettes prior to

17   the time of sale to nonmembers of the Tribe."  Id. at 159.  The Court held that since the legal

18   incidence of the tax fell on nonmembers, the state could require tribal smokeshops to affix state

19   tax stamps on cigarettes sold to nonmembers without infringing on the sovereignty of the tribe.

20   See id. at 159-60; Baker, 63 F.3d at 1489 (noting that Colville held that the tax fell upon

21   nontribal members).

22       Defendants ignore Colville entirely in their opening brief and instead argue that two

23   Washington Court of Appeal decisions hold that state cigarette taxes do not apply to Indians

24   purchasing or selling cigarettes on the reservation of the tribe in which they are enrolled.  (See

25   Dkt. No. 86 at 2.)  To the contrary, both cases reaffirm the validity of state taxation of on-

26   reservation cigarettes sales to nonmembers pursuant to the decision in Colville.  In Bercier v.

1  Kiga, 127 Wn. App. 809 (2004), the court clarified that Colville "still has precedential value and

2  allows state taxation of non-Indians and nonmembers Indians on reservation where tribal

3  members are exempt from taxation." Id. at 820.  Similarly, in Matheson v. Washington State

4  Liquor Control Bd., 132 Wn. App. 280 (2006), the court stated expressly that "non-Indians and

5  non-tribal Indians, those not enrolled with the tribe where they are doing business, must pay tax

6  on cigarette sales on reservations." Id. at 285 (citing WAC 458-20-192(2)(a), (5)).  The court

7  also recognized the continued validity of Colville.  Id.  Defendants' attempt to misrepresent the

8  holdings of these cases is not well taken.

9        Defendants finally cite Colville in their reply brief and attempt to distinguish it by

10  rearguing a point the Court rejected.  (Dkt. No. 105 at 5.)  Defendants argue that the incidence of

11  the state tax impermissibly falls on the Indian retailer.  (Id.)  However, the Court in Colville held

12  that Washington's cigarette tax scheme was "legally indistinguishable from the collection burden

13  upheld in Moe"—a case where the legal incidence of a cigarette tax "fell on the non-Indian

14  purchaser." Id. at 151, 159.  The state's cigarette tax falls on the purchaser, not on the tribal

15  retailer.  Baker, 63 F.3d at 1489; see also United States v. Mahoney, CR-05-2099, Dkt. No. 145

16  at 3 (E.D. Wash. Dec. 1, 2005).

17        Defendants' motion to dismiss for lack of predicate tax violations is DENIED.

18  E.    Motion in Limine

19        April Wilbur moves in limine to bar the use of any evidence with regard to whether

20  Defendants paid tribal cigarette taxes.  (Dkt. No. 51.)  The Court's rejection of Defendants' tax

21  retrocession theory renders this motion indefensible.  Whether or not the Defendants paid or

22  collected tribal taxes is central to their defense that the Tax Contract exempted their sales from

23  the State's tax requirements.  As explained above, the Tax Contract applies only to conforming

24  sales, which require, in part, evidence of tribal tax stamps.  Thus, whether or not the State taxes

25  were due on cigarette sales at the Trading Post to nonmembers and non-Indians involves, in part,

26  the factual question of whether the tribal stamps were on cigarette packaging at the Trading Post.

The evidence as to payment and collection of tribal taxes is probative of the alleged crimes and its value outweighs any risk of unfair prejudice or confusion. Fed. R. Evid. 403.

The Court DENIES the motion in limine.

F.     Treaty Defense

Defendants argue that the prosecution cannot be maintained because the decedents of Swinomish Indian Tribal Community reserved the right to free trade in tribal goods, including cigarettes, when they signed the Treaty at Point Elliot in 1885. The government relies on related Ninth Circuit authority and argues that regardless of the rights reserved, prosecution under the CCTA does not implicate those rights. The Court agrees with the government.

A federal law of general applicability will not apply to a tribe if doing so would abrogate a right guaranteed by Indian treaty. See United States v. Smiskin, 487 F.3d 1260, 1264 (9th Cir. 2007). The CCTA is a federal law of general applicability. See Baker, 63 F.3d at 1484. Defendants argue that the Swinomish Tribe reserved the right to trade cigarettes fee of taxation at the time the Tribe's ancestors signed the Treaty of Point Elliot on January 22, 1855. With regard to trade, the Treaty contains only one relevant clause:

> The said tribes and bands further agree not to trade at Vancouver's Island or elsewhere out of the dominions of the United States, nor shall foreign Indians be permitted to reside in their reservations without consent of the superintendent or agent.

(Dkt. No. 45-7 at 1.) The Point Elliot Treaty is otherwise silent on trade or taxation of the tribes.

It is black letter law that a treaty contains "not a grant of rights to the Indians, but a grant of right from them,—a reservation of those not granted." United States v. Winans, 198 U.S. 374, 381 (1905). Rights not explicitly abrogated in a treaty are presumed to have been reserved by the tribe. See Minnesota v. Mille Lacs Band of Chippewa Indians, 526 U.S. 172, 195-96 (1999). The government repeatedly ignores this rule of law in its briefing and at oral argument. (See, e.g., Dkt. No. 77 at 11-12.) The Court's inquiry does not presume that those rights not mentioned in the Point Elliot Treaty were given up by the Swinomish Tribe. Rather, the Court

must determine the scope of any reserved right and whether the State's cigarette taxation requirements violate any such right.

In interpreting ambiguous treaty provisions, the Court is guided by long-held canons of construction. First, a treaty is to be interpreted as it would have been understood by the tribal delegates present at the negotiation, "as justice and reason demand." Winans, 198 U.S. at 380; Tulee v. Washington, 315 U.S. 684, 684-85 (1942). Second, "any doubtful expressions in the Treaty should be resolved in the [Indian's] favor." Cree v. Flores, 157 F.3d 762, 769 (9th Cir. 1998). Third, in interpreting language, the Court is to "look beyond the written words to the larger context that frames the Treaty," including "the history of the treaty, the negotiations, and the practical construction adopted by the parties." Mille Lacs, 526 U.S. at 196 (quotation omitted).

At the hearing held on January 22, 2010, the 155-year anniversary of the Treaty at Point Elliot, Defendants presented the testimony of Dr. Daniel Boxberger with regard to the trading activities the Swinomish engaged in during in the mid-Nineteenth century. Defendants and the government presented no other testimony on this issue. Dr. Boxberger's testimony is the sole source on which the Court draws its factual findings with regard to the Swinomish's trading rights that may have been reserved at the time of treaty.

The Court makes the following findings of fact:

1. Dr. Boxberger is the Chair of the Department of Anthropology at Western Washington University and has an expertise in the area of the economics of native peoples in Washington at the time of treaties in the Nineteenth Century.
2. The native peoples who were the ancestors of the Swinomish Tribe resided along the Puget Sound. For the sake of simplicity the Court refers to all such peoples as Swinomish.
3. Dr. Boxberger has studied the culture and history of the Swinomish and has an extensive knowledge of the negotiations of the Treaty at Point Elliot.
4. The Swinomish were actively engaged in trade at the time of Treaty in 1855.
5. The Swinomish traded at many trading posts with the Hudson's Bay Company throughout the Puget Sound area and at Vancouver's Island.
6. The Swinomish traded furs and other goods.
7. This trade was important to the Swinomish.
8. Tobacco was a form of currency in the mid-Nineteenth Century.

9.      The Hudson's Bay Company traded tobacco for furs with the Swinomish.
10.     The Swinomish traded tobacco for other goods with Indians and non-Indians.
11.     At the time of treaty there were no excise taxes.
12.     The Swinomish neither paid nor collected taxes as part of their trade at the time of Treaty.
13.     The Swinomish signatories did not understand the Treaty at Point Elliot as restricting their trading practices.
14.     Neither the Swinomish nor the United States negotiators anticipated any taxation on the trade of goods at the time of Treaty.
15.     The State of Washington did not exist in 1855.

Based on these findings, the Court concludes that the Swinomish signatories to the Treaty at Point Elliot would not have intended to submit to be restricted in their trade in tobacco or other tribal products. The question remains, then, whether the CCTA restricts this reserved trading right.

Relevant Ninth Circuit authority suggests strongly that application of the CCTA to Defendants does not infringe on the rights reserved in the Treaty at Point Elliot. In Baker, the court held that the rights reserved in the Medicine Creek Treaty were not infringed by application of the CCTA. 63 F.3d at 1485. Baker is particularly helpful here. The Medicine Creek Treaty of 1854 contains a nearly identical provision regarding trade at Vancouver's Island and beyond as is found in the Treaty at Point Elliot. The Court acknowledges that it "must interpret a treaty right in light of the particular tribe's understanding of that right at the time the treaty was made. . . ." Smiskin, 487 F.3d 1267. However, the Court in Baker assumed that the "the Treaty intended no other restrictions on Indian trade" other than trade at Vancouver's Island and beyond the United States. 63 F.3d at 1485. This assumption is essentially the same as the Court's conclusion here with regard to the treaty rights secured by the Swinomish in signing the Treaty at Point Elliot. The Court does not find the CCTA to be a restriction on the trade in cigarettes, and compliance with Washington's cigarette tax scheme does not infringe on the rights reserved in the Treaty at Point Elliot. This is particularly so because the tax falls not on the tribal retailer, but on the nonmember and non-Indian purchaser. See Colville, 477 U.S. at 159.

The Court is aware that the Ninth Circuit has held the CCTA and Washington's pre-notification requirements for transport of unstamped cigarettes impermissibly burdened the Yakama Nation's treaty right to unfettered travel. <u>Smiskin</u>, 487 F.3d 1260. That case is distinguishable. <u>Smiskin</u> involves an entirely different treaty that contains an express reservation of rights as to travel. <u>Id.</u> at 1262. Through the Yakama Treaty of 1855, the Yakama Nation expressly "secured to them . . . the right, in common with citizens of the United States, to travel upon all public highways." <u>Id.</u> at 1262 n1. The Ninth Circuit has held that this treaty provision secured the Yakama "the right to transport goods to market over public highways without payment of fees for that use." <u>Cree</u>, 157 F.3d at 769. It is a right "with no conditions attached." <u>Smiskin</u>, 487 F.3d at 1266. Here, the Court does not reach the same conclusion as to the scope of the treaty rights in the Treaty at Point Elliot, based on the facts presented by Dr. Boxberger. For example, the Court has heard no testimony similar to that relied on in <u>Smiskin</u>—that the United States' agents at the treaty negotiations "repeatedly emphasized . . . that the tribal members would retain the 'same liberties . . . to go on the roads to market.'" <u>Id.</u> at 1265 (quotation omitted). The Court is faced simply with silence in the Treaty at Point Elliot. Given the differences between the silence in the Treaty at Point Elliot and the express provision of the Yakama Treaty, the Court is not persuaded that <u>Smiskin</u> offers a proper resolution of the issue before it. The reasoning of <u>Baker</u> provides better guidance for the dispositive issue at hand.

The Court DENIES the motion to dismiss on this issue. The Court does not address the government's other contentions that April and Brenda Wilbur cannot enforce the treaty right or that only the Swinomish Tribe may assert the right.

F.    <u>Motion to Sever</u>

Brenda Wilbur moves to sever her trial from her codefendants. (Dkt. No. 89.) The Court DENIES the request.

Under Fed. R. Crim. P. 8(b), "[t]he indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same

1   series of acts or transactions, constituting an offense or offenses."  "There is a preference in the

2   federal system for joint trials of defendants who are indicted together."  <u>Zafiro v. United States</u>,

3   506 U.S. 534, 537 (1993).  It is within this Court's discretion to sever the trials of codefendants

4   where "a defendant may be significantly prejudiced by a joint trial with codefendants."  Fed. R.

5   Crim. P. 14.

6          Brenda Wilbur asks for severance on the basis that Marvin Wilbur, Sr. will offer

7   exculpatory testimony, but only in a trial separate from his own.  "When the reason for severance

8   is the need for a codefendant's testimony, defendant [sic] must show [1] that he would call the

9   codefendant at a severed trial, [2] that the codefendant would in fact testify, and [3] that the

10  testimony would be favorable to the moving party."  <u>United States v. Hernandez</u>, 952 F.2d 1110,

11  1115 (9th Cir. 1991) (quotation omitted).  Defendant "must show more than that the offered

12  testimony would benefit h[er]; [s]he must show that the codefendant's testimony is 'substantially

13  exculpatory' in order to succeed."  <u>United States v. Mariscal</u>, 939 F.2d 884, 886 (9th Cir. 1991)

14  (quotation omitted).

15         Marvin Wilbur, Sr.'s proposed testimony is not exculpatory in light of the charges

16  pending against Brenda.  His proposed testimony is that ". . . when Brenda asked me if it was

17  okay to order cigarettes that did not have any state tax stamps, I told her that it was perfectly

18  okay to do that."  (Dkt. No. 89 at 4.)  As the Ninth Circuit held in <u>Baker</u>, a "mistake as to law is

19  not a proper defense to a CCTA violation."  63 F.3d at 1498.  This is due to the fact that the

20  CCTA does not "require knowledge that the actions engaged in violate the law."  <u>Id.</u> at 1491.  A

21  mistake as to a fact, however, could be exculpatory.  <u>Id.</u> at 1491-92.  For example, "if the

22  defendants asserted reasonable grounds to believe the tax on cigarettes had been paid," they

23  could assert a defense.  <u>Id.</u> at 1492.  Here, however, Marvin Wilbur, Sr.'s testimony is simply as

24  to the applicability of the state taxes, not as to the fact of whether the taxes had been paid.  His

25  testimony is not exculpatory.

26

1      Brenda Wilbur has not satisfied her burden of demonstrating that the testimony she seeks

2  to offer in a severed trial is substantially exculpatory.  The Court does not find that she will be

3  prejudiced by being tried jointly with her three codefendants.  Her motion is DENIED.

4  G.      Motion to Suppress

5      Defendants jointly move to suppress all documents seized by law enforcement during the

6  May 15, 2007 search.  (Dkt. No. 90.)  Defendants argue that the warrant fails to comply with the

7  Particularity Clause of the Fourth Amendment and that it is overbroad.  (Id.)  The search warrant

8  is not defective and the documents will not be suppressed.

9      The Ninth Circuit has clarified that particularity and breadth are two different

10  requirements of every warrant.  United States v. SDI Future Health, Inc., 568 F.3d 684, 702 (9th

11  Cir. 2009).  Particularity "is the requirement that the warrant must clearly state what is sought."

12  Id. (quotation omitted).  "Breadth deals with the requirement that the scope of the warrant be

13  limited by the probable cause on which the warrant is based."  Id. (quotation omitted).  The

14  Court addresses both legal issues after examining the terms of the warrant and the testimony

15  taken at the January 22, 2010 hearing.

16      1.      Warrant

17      On May 10, 2007, Agent Keller applied for and obtained a warrant to search three

18  addresses that form what is referred to as "the Trading Post at March Point Compound."  (Dkt.

19  No. 90-2 at 2.)  Agent Keller's thirty-eight page affidavit in support of the warrant describes in

20  detail an eight-year investigation into the sale of contraband cigarettes at the Trading Post, the

21  relevant criminal law, the area and buildings to be searched, the common practices of persons

22  engaged in the sale of contraband cigarettes, and methods for searching seized computers.  (Dkt.

23  No. 90-3.)  The warrant incorporates into it three photographs of the March Point compound and

24  a precise description of the area to be searched.  (Dkt. No. 90-2 at 5-12.)  The search warrant

25  encompasses the Trading Post business storefront and attached residence, a detached garage, a

26

1   large office/warehouse building linked to fireworks sales, and several vehicles and semi trailers.

2   (Dkt. No. 90-2 at 5-6 (Attachment A).)

3       Attachment B, which is incorporated into the warrant, provides the list of items to be

4   seized.  Paragraph A states that agents sought "any and all business records documents and/or

5   other materials . . . pertaining to the conspiracy to obtain, possess, and sell contraband cigarettes .

6   . . and the laundering of monetary instruments, alleged in the search warrant affidavit including,

7   but not limited to" twenty-one specific businesses and any business controlled by the defendants

8   or related to contraband cigarettes.  Paragraph B then identifies the types of items sought with

9   considerable detail, including specific types of documents,[2] computer systems and their

10  components, contraband cigarettes, cartons, and cases, and "bulk cash."  (Dkt. No. 90-2 at 15-

11  17.)

12

---

13  [2] The list of documents includes, but is not limited to:

14      1.  Purchase and sales invoices, expense receipts, acquisition, storage, purchase and
            sale contracts and/or agreements and lease agreements;

15      2.  Accounting books, records and files including general journal and general ledgers
            and subsidiary journals and ledgers;

16      3.  Bank account information including bank statements, deposit tickets, canceled

17          checks, Certificates of Deposit (CD), savings account information, safe deposit
            box information, credit card statements for domestic and foreign bank accounts,

18          copies of money orders and cashier's checks;

        4.  Documents to show all purchase and sales of property and assets held by the
19          business entities and individuals listed above;

        5.  Federal and state income tax returns and return preparation files including all
20          schedules, attachments and work papers;

21      6.  Loan documentation including loan agreements, promissory notes, Deeds of
            Trust, Security Agreements, payment records, and financial statements submitted

22          to any lender or financial institution;

        7.  Letters, notes, memoranda, facsimiles, notifications and contracts between
23          business entities and individuals described above and/or other unknown
            individuals involved in the sale and or purchase of cigarettes and tobacco products

24          to include email correspondence; and

25      8.  Customer lists and/or databases whether stored in paper or electronic format
            including lists of names, telephone numbers, email addresses and fax numbers

26          and addresses.

1

2        2.    <u>Findings of fact</u>

3       At the hearing, the Court heard testimony from Agent Keller and Agent Younger.  On the

4  basis of their testimony, the Court makes the following findings of fact:

5        1.    On May 14, 2007, Agent Keller briefed a team of roughly 20 agents who participated in the search of the Trading Post Compound.

6        2.    The warrant and affidavit was presented to the agents at this meeting.

7        3.    The search of the Trading Post Compound occurred on May 15, 2007.

8        4.    Agents searched the Trading Post smokeshop, the attached residence, the fireworks warehouse/office, and semi trailers.

9        5.    Agent Younger seized eight boxes from the main office area, seven from the main office safe room area, four boxes from the loft area above the retail store, and one box from Marvin Wilbur, Sr.'s office.  These boxes contained financial records.

10        6.    Agent Younger seized two partially-filled boxes of financial records from the residence, which shares a common wall with the smokeshop storefront.

11        7.    Agent Younger seized four boxes of financial records from the fireworks office/warehouse.

12        8.    Agent Younger seized eighty-four boxes of financial documents from one semi trailer that contained roughly 500 boxes of paper records.

13        9.    Agent Younger selected the eighty-four boxes based on whether they contained records pertaining to the sale of cigarettes after August 1, 1999.

14       10.    Boxes were seized from the semi trailer even if only one document in the box was within the scope of the search.

15       11.    Agent Younger made the decision to seize an entire box from the semi trailer even if there was only one relevant document so that he could both preserve the order in which he found the documents and complete the entire search in one day.

16       12.    Agent Younger was guided by the terms of the search warrant is seizing documents during the search.

17       13.    Agent Keller had a copy of the warrant with him during the search on May 15, 2007.

18       14.    Agents seized 52 computers from the Trading Post Compound.

19       15.    Digital images of the computer hard drives were made and the computers were returned 3 or 4 days later.

20       16.    An ATF auditor, Stephanie Wall, who was not connected to the search, performed an examination of the copies made of the computers roughly 2 years after the search warrant was executed.

21       17.    Agent Wall examined the hard drive for only the information sought in the search warrant.

22       18.    Agent Keller stated that the lack of manpower was a cause for the delay in searching the digital images of the hard drives of the seized computers.

23

24  (Dkt. No. 90-2 at 15-16.)

25

26

19. A security camera recorder was seized in the search and not returned to Defendants.

3.  <u>Particularity</u>

"To determine whether a warrant lacks sufficient specificity, we must examine both the warrant's particularity. . . ." <u>United States v. Kow</u>, 58 F.3d 423, 426 (9th Cir. 1995). The warrant's description "must be specific enough to enable the person conducting the search reasonably to identify the things authorized to be seized. <u>SDI</u>, 568 F.3d at 702 (quotation omitted). However, a search warrant "need only be reasonably specific, rather than elaborately detailed, and the specificity required varies depending on the circumstances of the case and the type of items involved." <u>United States v. Bridges</u>, 344 F.3d 1010, 1016 (9th Cir. 2003). Warrants that "describe generic categories of items are not necessarily invalid if a more precise description of the items subject to seizure is not possible." <u>SDI</u>, 568 F.3d at 702.

Here, the warrant satisfies the particularity requirement of the Fourth Amendment. The warrant limits the search to an eight-year period that tracks the date of Agent Keller's investigation and limits the search to items tied to crimes charged. The list of crimes includes wire and mail fraud, a count not charged. For purposes of particularity, this is not problematic because other language in the warrant specifically ties the search to violations of the CCTA and the money laundering statute. While the warrant is broad, the evidence that could relate to the crimes is similarly broad. Attachment B provides sufficient detail as to the types of documents and items to be seized so as to "prevent a general, exploratory rummaging in a person's belongings." <u>Bridges</u>, 344 F.3d at 1016 (quotation omitted). The warrant passes constitutional scrutiny. <u>See</u> <u>SDI</u>, 568 F.3d at 702 (noting that a warrant that listed for seizure rolodexes, address books and calendars was sufficiently particular because it "enable[d] the person conducting the search reasonably to identify the things authorized to be seized")

4.  <u>Breadth</u>

Defendants argue that the scope of the warrant exceeded the scope of the unchallenged probable cause underlying the warrant's issuance. The warrant does not suffer from overbreadth.

A warrant may be overly broad if it permits the search team to seize items for which there is no probable cause. The Particularity Clause "prevents officers from engaging in general, exploratory searches by limiting their discretion and providing specific guidance as to what can and cannot be searched or seized." United States v. Adjani, 452 F.3d 1140, 1147 (9th Cir. 2006). "[T]his means that there [must] be probable cause to seize the particular thing[s] named in the warrant." SDI, 568 F.3d at 702 (quotation omitted). "'As to what is to be taken, nothing is left to the discretion of the officer executing the warrant.'" Bridges, 344 F.3d at 1016 (quoting United States v. Cardwell, 680 F.2d 75, 77 (9th Cir. 1982)). "The search and seizure of large quantities of materials is justified if the material is within the scope of the probable cause underlying the warrant." SDI, 568 F.3d at 703 (quoting United States v. Hayes, 794 F.2d 1348, 1355 (9th Cir. 1986)). A warrant that includes phrases such as "may include, but is not limited to" and "other items" is not overly broad so long as there is sufficient "context of authorization for a search" linked to a particular crime. United States v. Reeves, 210 F.3d 1041, 1046 (9th Cir. 2000), cert. denied, 531 U.S. 1000 (2000).

The warrant is not overbroad. It is important to consider the context in which the warrant was issued. The search was the product of an eight-year investigation into the sale, possession, and transport of contraband cigarettes and money laundering from the proceeds thereof at the Trading Post. That the warrant is broad is therefore not surprising. The language of the warrant limited the search to items specifically relating to the sale, possession, and transport of contraband and the laundering of monetary proceeds therefrom. (Dkt. No. 90-2 at 14.) The items listed in Attachment B are all tied to "the conspiracy to obtain, possess, and sell contraband cigarettes . . . and the laundering of monetary instruments" from August 1, 1999 to May 15, 2007. (Id.) Although the Attachment B lists the items to be seized as "including, but not limited

1    to" certain types of documents, the scope of the warrant is sufficiently circumscribed by its

2    context to pass scrutiny.  <u>Reeves</u>, 210 F.3d at 1046.

3         That the search included the residence is not a basis for invalidating the warrant.  First,

4    Agent Keller's affidavit explains that persons engaged in money laundering "often retain at their

5    business or at their personal residence, a separate set of accounting records" of relevance to the

6    crimes committed.  (Dkt. No. 90-3 at 28.)  Second, the residence is part of the same building as

7    the Trading Post smokeshop and they share a common wall.  This proximity adds to the reasons

8    to search the home in addition to the adjoining smokeshop, especially in light of the money

9    laundering charges.  Third, the search warrant was for the entire Trading Post Compound, which

10   included three separate addresses, several buildings, and many trailers that were all potential

11   sources for evidence of eight years of the sale and transport of contraband cigarettes and the

12   money laundering of the proceeds thereof.  <u>See</u> <u>United States v. Roberts</u>, 747 F.2d 537, 545 (9th

13   Cir. 1984).  There was probable cause to search the residence.

14        Defendants have also argued at oral argument that the search was overbroad because

15   agents seized boxes that contained documents outside the scope of the criminal activity charged.

16   Agent Younger testified that of the boxes he seized from the semi trailer some contained only

17   one or two relevant documents.  Agent Younger also testified that he did this because he did not

18   want to remove individual documents from boxes and then be unable to return them to their

19   proper location.  Agent Younger was also concerned that the documents could not be searched,

20   sorted, copied, and returned to their proper place in the time he had at his disposal, given the fact

21   there were roughly 500 boxes.  The Court does not find this to be evidence of an impermissibly

22   broad search.  The motivation to seize the boxes was primarily born out of practicality, not out of

23   a desire to fish for evidence.  <u>See</u> <u>United States v. Tamura</u>, 694 F.2d 591, 597 (9th Cir. 1982)

24   (holding that "the exclusionary rule does not require the suppression of evidence within the

25   scope of a warrant because other items outside the scope of the warrant were unlawfully taken,"

26   where the seizure is due to practicality rather than a desire to indiscriminately fish for evidence).

The warrant is not transformed into a general one merely because some documents outside its scope may have been taken. See id.

The search warrant is sufficiently circumscribed such that it does not violate the Fourth Amendment. The Court need not reach the government's good faith arguments.

5. Computer search

Defendants argue that the search of the computers was overbroad and failed to comply with the search guidelines set forth in United States v. Comprehensive Drug Testing, 579 F.3d 989, 1006 (9th Cir. 2009) (en banc). (Dkt. No. 90 at 17.) Defendants' argument fails for two reasons. First, the warrant properly set forth probable cause to seize computers used at the Trading Post at March Point Compound. The types of computers and related accessories sought were listed with particularity and the evidence sought within them related to the crimes alleged to have been committed. There is no defect in the search warrant on the ground of overbreadth or lack of particularity. Second, at the time of the warrant was issued and executed, the Ninth Circuit had yet to decide Comprehensive Drug Testing. The court makes clear in that case that its rules regarding computer searches apply prospectively. Id. at 1000 ("To guard against such unlawful conduct in the future, the warrant application should normally include . . . a protocol for preventing agents involved in the investigation form examining or retaining any data other than that for which probable cause is shown." (emphasis added)). That the warrant application in 2007 did not foresee this ruling is obviously no defect. The government also appears to have complied with Comprehensive Drug Testing's search protocols, by using an agent who was not part of the initial search to look for and segregate only that data which was within the scope of the search warrant for which there was probable cause. See id.

Defendants' motion to suppress is DENIED in total.

**Conclusion**

Defendants have not demonstrated a basis on which to dismiss the Indictment. Defendants' construction of the Tax Contract is untenable and it cannot serve as a basis for

escaping prosecution under the CCTA and the federal money laundering statute. Prosecution under these laws does not violate Due Process. The motion to dismiss on tax grounds is DENIED. Defendants' motion to dismiss vis-à-vis predicate acts is DENIED. It is based on an erroneous interpretation of the law. Given the Court's construction of the Tax Contract, April Wilbur's motion in limine is without merit and DENIED.

While Defendants have shown that the Swinomish Tribe reserved a right to trade in tribal goods, including tobacco, they have not shown that this right is infringed upon in this case. The Court DENIES the treaty-based motion to dismiss.

Brenda Wilbur's motion to sever is DENIED. The proposed testimony from her codefendant is not exculpatory.

Defendants' motion to suppress is DENIED. The warrant, while broad, is sufficiently particular and not overly broad.

The Clerk shall transmit a copy of this Order to all counsel of record.

Dated this 4th day of February, 2010.

Marsha J. Pechman
United States District Judge